# Bank of America Corporate Card Service Agreement

This Bank of America Corporate Card Service Agreement (the "Agreement") is made by and between FIA Card Services, N.A., a Bank of America company, ("Bank of America"), and WirelessPCS FL, LLC ("Company") and shall be effective as of 09-29-11 ("Effective Date").

The terms "we", "us" and "our" refer to Bank of America. The terms "you" and "your" refer to Company.

With our Corporate Card Services you are allowed to open Card Accounts for your business purposes. You may select one or more of the following card programs: purchasing card program, travel and entertainment card program, accounts payable card program or fleet card program (each a "Service", collectively, the "Services"). You may begin using a Service once we have approved such use and we have received all required and properly executed forms and you have successfully completed any testing or training requirements. Whenever you use a Service, you agree to be bound by this Agreement, as amended from time to time, and to follow the procedures in the applicable Materials.

## DEFINITIONS

**Billing Statement.** The official invoice provided to you, Participant and/or Cardholder which identifies each Transaction posted during the billing cycle, the date of each Transaction and the applicable fees and charges, payment amount due and Payment Due Date.

**Business Day.** Each day on which we are open for business related to the Services.

**Card.** Each plastic charge card which we issue for your Card Account using a Service.

**Card Account.** Each MasterCard® or Visa® account which we issue to you or to a Cardholder with respect to a Service, including a Cardless Account.

**Card Administrator.** One or more individuals designated by you in writing, as our primary contact for the Card Accounts, who is authorized to take actions necessary or appropriate to maintain the Card Accounts, including without limitation designating persons to receive Card Accounts, receiving communications from us related to the Card Accounts, requesting the closure of Card Accounts and otherwise communicating with us with respect to the Card Accounts.

**Cardholder.** Your employee or any other person who you designate in writing and who we approve to receive a Card. If you or a Cardholder makes a Card Account number or Convenience Check available to another party, that person will also be considered a Cardholder.

**Cardless Account.** An Account for which we assign only an account number, but no Card is issued.

**Cash Advance.** Use of a Card Account to obtain cash from a participating financial institution, merchant or Automated Teller Machine, to write a Convenience Check or to obtain items readily convertible into cash, such as money orders, travelers checks, foreign currency, lottery tickets, casino chips and race-track wagers.

**Convenience Check.** A check which we may provide to you, upon your request, to draw on a Card Account.

**Grace Days.** The number of days after the Billing Statement closing date within which payment is due.

**Guarantor.** A person or entity, other than you or a Participant, that agrees to assume responsibility for the obligations of this Agreement, including payment of any amounts owed.

**Materials.** The Software, user identification codes, passwords, codes, keys, test keys, security devices, embedded algorithms, digital signatures and certificates, other similar devices and information, User Documentation and related documentation we provide to you.

**Participant.** A Subsidiary, affiliate or division of yours which you designate in writing on a Participant Account Form and which we approve, for us to issue a Card Account with its own account number. A Participant Account Form, upon completion by you and approval by us, will be made a part of this Agreement.

**Payment Due Date.** The payment due date shown on the Billing Statement which date shall be the last day of the Grace Days.

**Software.** Web-based applications accessed via a Website and/or the programs and data files provided by us for use on a computer in connection with the Services.

**Subsidiary.** Any entity in which more than 50% of the ownership interest is owned, directly or indirectly, by you. The term "Subsidiary" does not include affiliates or other entities in which 50% or less of the ownership interest is owned, directly or indirectly, by you.

**Transaction.** The purchase or reservation of goods or services or a Cash Advance made or facilitated by use of a Convenience Check or Card Account.



EXHIBIT A

Bank before completing the Transaction. If Company advises the Bank in writing of its desire to restrict Transactions to those merchants falling within up to five (5) categories designated by the Bank, the Bank will take reasonable steps to prevent authorization of other types of Transactions. However, the Bank will not be liable to Company if merchants, suppliers or financial institutions nonetheless accept a Card or the Account for that Transaction type; and (g) the Bank is not liable if a merchant or supplier does not honor a Card or if authorization is not given.

4. LICENSE TO USE COMPANY'S MARKS. Upon Company's request, Bank may place Company's trademark, tradename, service mark and/or designs ("Company's Marks") on the Cards and collateral materials. Company will provide the graphics to Bank in sufficient time to allow for review and approval by Bank and, if necessary, the respective card association. Company grants to Bank a non-exclusive license to use, during the term of the Agreement, Company's Marks on the Cards and on other materials related to the Accounts. If, as Company requests, Bank places Company's Marks on the cards or collateral materials, Company agrees that the indemnity under Section 26 of this Agreement covers any claim that the use of any Company Marks infringes the intellectual property right of any third party.

5. CHARGE LIMIT. Company will be given one total charge limit for all Company Accounts ("Aggregate Charge Limit"). Each Card will have its own charge limit ("Card Limit"). In its sole discretion, the Bank may increase or decrease the Aggregate Charge Limit or any Card Limit. Company will not incur obligations to the Bank which would cause the Account's unpaid balance to exceed the Aggregate Charge Limit. If Company exceeds the Aggregate Charge Limit or a Cardholder exceeds the Card Limit, the excess will be deemed immediately due and payable by Company at the option of the Bank. If the Aggregate Charge Limit or a Card Limit is exceeded, or if an Account payment is late, the Bank will have the right not to allow any further Transactions until the Account is brought current and the unpaid balance is within the Aggregate Charge Limit.

6. COMPANY LIABILITY; SECURITY INTEREST. Company will pay Bank for all Transactions, regardless of the purpose for which a Transaction is made, and for applicable fees and charges described below. However, if there are fewer than 10 Cards issued for the Account, Company's liability for Unauthorized Use will not exceed $50 on each Card. Company's responsibility for Card and Account usage will continue until the later of: (1) Company's notice to the Bank to close the Card or the Account plus a reasonable time to process such information and (2) payment for Transactions made before the Bank closes the Card or the Account to future use. Company does hereby grant to Bank a security interest and contractual right of setoff in and to all deposits now or subsequently maintained by the Company with Bank or any of its affiliates and subsidiaries. In connection with that grant, the Company authorizes Bank to enter into a master control agreement with its affiliates and subsidiaries authorizing, upon the occurrence and continuance of any default under this Agreement, the disposition of funds in any such deposits to satisfy all liabilities incurred hereunder, without the further consent of the Company. The grant of this security interest shall survive termination of this Agreement.

7. BILLING STATEMENTS. The Bank will provide a monthly billing statement(s) ("Billing Statement") to the Card Administrator or to such other Company employee or other person as Company designates in writing. Each Billing Statement will identify each Transaction posted during the billing cycle covered in the Billing Statement and the date of each Transaction. The Billing Statement will also list any fees and charges which apply. Where Company has elected individual billing for travel and entertainment Transactions, Bank will provide the Billing Statement covering the use of the relevant individual Card to the Cardholder. A Cardholder's address for receipt of a Billing Statement will be the address provided by Company or Cardholder to Bank and accepted by Bank.

8. PAYMENTS. Company will pay the Bank the total amount shown as due on each Billing Statement on or before the payment due date shown on that Billing Statement. If Company does not make payment in full by the payment due date, in addition to its other rights under this Agreement, the Bank, at its option, may assess a late fee and finance charge in accordance with this Agreement. There is no right to defer any payment due on an Account. In addition, Company will pay the Bank for all fees and charges according to the schedule of charges currently in effect for the Company. All charges are subject to change upon 30 days prior written notice to the Company, except that any increase in charges to offset any increase in fees charged to the Bank by any supplier for services used in delivering the services covered by this Agreement may become effective in less than 30 days.

9. ACCOUNT FEES.

A. Annual Fee. No annual fee shall apply to the Accounts for the first twelve billing cycles from the date the first Account is established hereunder. Thereafter, the annual fee will be charged to each Account on the Annual Fee Billing Date. The "Annual Fee Billing Date" shall be, initially, a Bank-selected date during the thirteenth billing cycle of the first Account established hereunder and thereafter, each successive twelve-month anniversary of such date. For Accounts opened after the Annual Fee Billing Date, the initial annual fee shall be a pro-rated amount and shall be charged to the Account during the first billing cycle. The amount of the annual fee will range from $0 to $25.00 and is subject to change each year, depending on Company's Actual Net Transaction Volume. "Actual Net Transaction Volume" means the total dollar amount of purchases charged to all Accounts less all credits, for the twelve complete billing cycles immediately preceding the respective

Annual Fee Billing Date. If the Actual Net Transaction Volume is $250,000 or greater, the annual fee will be $0; If it is less than $250,000, the annual fee will be $25.00. Cash Access Transactions are not included in Actual Net Transaction Volume.

B. Other Account Fees. A reporting fee will be charged to one of Company's Accounts each month, the amount of which is as follows: Visa Information Management Internet based reporting, with or without Expense Report workflow module, $15.00. Detailed paper reporting $25.00. A fee of $5.00 will be charged for each book of ten Convenience Checks. An overlimit fee of $20.00 for individually-billed Accounts and $250.00 for centrally-billed Accounts will be charged if, at any time during a billing cycle, an Account Card Limit is exceeded. A returned payment fee of $20.00 will be charged for any payment on an Account that is returned to the Bank unpaid. A copy charge of $3.00 will be charged for any record requested on an Account. A delivery fee for Cards will be charged as follows: (i) US Mail (Default): No Fee; (ii) Bulk Mail: No Fee; (iii) Overnight: $35.00; (iv) 2 day: $20.00. A late payment fee of $29.00 for individually-billed Accounts and $250.00 for centrally-billed Accounts will be charged if Bank does not receive payment of the entire balance by the respective payment due date. A custom merchant profile fee of $250.00 will be charged for each template. A fee of $250.00 will be charged for each Company Card logo request; custom Card design fees will vary depending on request. A fee of $2,500.00 will be charged for each custom interface. Fee per card for Executive Cards with additional benefits including concierge services over 10 is $75.00 per Card per year.

10. FINANCE CHARGES

A. Finance Charge On Past Due Balance. In the event Company fails to pay the total amount shown as due on a Billing Statement by the Payment Due Date shown on that Billing Statement, the amount unpaid shall be subject to a finance charge starting on the first day of the next billing cycle. To calculate the finance charges for a billing cycle, the daily periodic rate is multiplied by the average daily balance, and that product is multiplied by the number of days in the billing cycle. The daily periodic rate is the annual percentage rate divided by 365. The annual percentage rate is the prime rate published in the Money Rates section of The Wall Street Journal in effect on the first day of each calendar month (the "Prime Rate") plus six (6) percentage points. The average daily balance is the sum of the daily past due balances (including, for each day, finance charges from previous day) less payments credited to the past due balance, divided by the number of days in the billing cycle.

B. Cash Access Fee Finance Charge. 3% of the cash advance with a $2.00 minimum.

C. Convenience Check Finance Charge. 3% of amount of transaction with a $2.00 minimum.

11. CARD ADMINISTRATOR. Company will identify one or more Card Administrator(s). Only a Card Administrator or Company's finance or accounting officer or employee with actual, implied or apparent authority may add, change or eliminate a Card Administrator by giving the Bank written notice. Company must give the Bank prompt written notice of any addition, change or elimination of a Card Administrator.

12. LOST OR STOLEN CARDS; UNAUTHORIZED USE. In the event of possible loss or theft of a Card, Convenience Check (where applicable) or Account or Unauthorized Use, Company agrees to notify Bank by phone at 1-800-300-3084, or write to Commercial Card Services, P.O. Box 53101, Phoenix, Arizona 85072-3101. Company agrees to give such notice as soon as practical, but in no event later than the Business Day after discovery of the known or suspected loss or theft or Unauthorized Use. Company agrees to assist Bank in determining the facts and circumstances relating to any loss or theft or Unauthorized Use of Cards, Convenience Checks (where applicable) or Account including, where requested by Bank, obtaining from the Cardholder an affidavit, statement or proof of loss. Once Bank has issued Devices pursuant to this Agreement, all Transactions incurred by use of such Devices by a Cardholder will be assumed authorized unless and until Bank receives written notice that the Cardholder is no longer authorized to use the Devices. If notice is given as set forth in this section and Company assists the Bank in investigating facts and circumstances relating to the loss, theft or possible Unauthorized Use, then Company will not be liable for Transactions resulting from Unauthorized Use. If the Bank has issued fewer than ten (10) Accounts to Company, Company's liability for Transactions by a person who does not have actual, implied or apparent authority to use the Card, Account or Convenience Check and whose use does not result in a direct or indirect benefit to Company will not exceed $50 on each Card.

13. MERCHANT/SUPPLIER CLAIMS AND DISPUTES. The Bank will have no liability for goods or services purchased by use of the Account or any Card. Company will make a good-faith effort to resolve with a merchant or supplier any claim or dispute arising from a Transaction and waives any claim against the Bank for any merchant's or supplier's refusal to honor any Device. In a dispute with a merchant or supplier, the Bank will be subrogated to the rights of Company and each Cardholder against the merchant or supplier, and Company will assign (and require the affected Cardholder to assign) to the Bank its rights to assert a billing error against the merchant or supplier. Company will, and will require the Cardholder to, do whatever is necessary to enable the Bank to exercise those rights. The Bank may reverse from the Account any credits relating to the dispute.

14. TRANSACTIONS IN OTHER CURRENCIES. If Company makes a Transaction in currency other than U.S. dollars, Visa or MasterCard will convert the charge or credit into a U.S. dollar amount. The conversion rate on the processing date

may differ from the rate on the date of the Transaction. The exchange rate used by Visa will either be (i) a rate selected by Visa from a range of rates available in wholesale currency markets for the applicable central processing date, which rate may differ from the rate Visa receives, or (ii) the government-mandated rate in effect for the central processing date. MasterCard will use an exchange rate of either (i) a wholesale market rate or (ii) a government-mandated rate. The Bank may add a fee to the U.S. dollar amount of any Transaction that is made in a foreign currency (the "International Transaction Fee"). The International Transaction Fee is set forth in the schedule of charges currently in effect for Company and will be shown in the Activity section on the Billing Statement and aggregated in the Other Fees category on the Summary section of the Billing Statement.

15. REPRESENTATIONS AND WARRANTIES. Company represents and warrants to the Bank on and as of each day on which the Bank provides the services covered by this Agreement that: (i) the Agreement constitutes Company's duly authorized, legal, valid, binding and enforceable obligation; (ii) Company's performance of its obligations will not violate any law, regulation, judgment, decree or order applicable to Company or facilitate illegal transactions, for example those prohibited by the Unlawful Internet Gambling Enforcement Act, 31 U.S.C. Section 5361 et seq.; (iii) the debiting of any account as provided in the Agreement is not inconsistent with the use of that account; (iv) all approvals and authorizations required to permit the execution, delivery, performance and consummation by Company of the Agreement and the transactions contemplated under the Agreement have been obtained, including but not limited to due authorization from each applicable third party to allow Company to transfer funds and access information from such party's account; (v) there is no lawsuit, tax claim or other dispute pending or threatened against Company which, if lost, would impair Company's financial condition or ability to pay the Bank under the terms of the Agreement; (vi) all financial and other information that it has supplied or will supply to the Bank, including without limitation, all information on its application for the Account, is accurate and sufficiently complete to give the Bank accurate knowledge of its financial condition; and (vii) each Cardholder is a current employee or agent of Company.

16. PERIODIC REVIEW OF COMPANY. During the term of this Agreement, whenever the Bank requests information from Company for the purpose of reviewing Company's ability to perform its obligations under this Agreement, Company will furnish the information promptly. The Bank and its affiliates and processing agents may exchange information about Company. Company will notify the Bank in writing immediately of any change in the business name, the principal officers such as the Chief Executive Officer and Chief Financial Officer, the mailing address or the phone number of Company. Company will also notify the Bank of any change of mailing address or phone number of any of its Cardholders.

17. SUSPENSION: TERMINATION; ACCELERATION.

A. Either party may terminate this Agreement upon 60 calendar days prior written notice to the other party.

B. In addition to its other rights, should any of the following events occur, the Bank may, at its option, immediately and without notice to Company, suspend its operation hereunder or terminate this Agreement, and in either such event, all amounts outstanding will become immediately due and payable: (a) dissolution, bankruptcy, liquidation or insolvency of Company. The use of Cards or the Account will be considered the extension of "financial accommodations" under the Bankruptcy Code; (b) failure of Company to pay or perform as agreed under this Agreement, any other agreement relating to this Agreement, or any other agreement Company has with the Bank or any affiliate of Bank; (c) institution of attachment, garnishment, or levy proceedings against Company, which is not paid or released within 20 days; (d) change in ownership of Company in excess of 50%; (e) the Bank's receipt of false or misleading information or representations from Company; (f) death of any owner, if Company is a sole proprietorship; (g) death of any trustor, if Company is a trust; (h) death of any partner, if Company is a partnership; (i) death of any majority shareholder, if Company is a corporation or limited liability company; (j) appointment of a receiver or similar official for Company's business; (k) termination of the business; (l) occurrence of any material default under any agreement in connection with any credit Company has obtained from anyone else or which Company has guaranteed; (m) occurrence of any default under any guaranty made in connection with this Agreement or the occurrence of any event which renders the guaranty ineffective; (n) the occurrence of a material adverse change in Company's financial condition, properties or prospects or ability to repay Transactions; or (o) Company's failure to meet the criteria initially used by the Bank to approve Company's application for a Commercial Card Account.

C. Upon termination of this Agreement, Company will immediately destroy, or instruct Cardholders to destroy, all Devices. Termination will not relieve Company of liability for any charges or other obligations under this Agreement. After termination, this Agreement (except the ability to use the Account for additional Transactions) will remain in force until all Transactions and Company's other obligations under this Agreement are paid and satisfied in full except that if termination occurs pursuant to Section 17.B. above, then all amounts outstanding will become immediately due and payable. After termination, Company and Cardholders shall make no new Transactions on the Account. However, if any Transactions are made notwithstanding the above, Company will be liable until they are paid in full.

18. VISA EXTRAS. Company's participation in Visa Extras shall be subject to the Visa Extras General Terms and Conditions, a copy of which is enclosed with the Commercial Card Account Application. Company acknowledges receipt of

the Visa Extras General Terms and Conditions and will make a copy of the Visa Extras General Terms and Conditions available to each individual Cardholder who is chosen by Company to participate in Visa Extras. Bank of America and Visa each has the right to suspend or terminate the Visa Extras Program or Company's participation in the Visa Extras Program, at any time without prior notice. Bank of America and Visa each reserves the right to add, eliminate or modify a specific reward or the point and reward structure of the Visa Extras Program at any time. A non-refundable annual participation fee applies whether or not any points are earned. The annual participation fee will be charged to each Account within the month in which the Account is first enrolled and annually thereafter. Refer to the Visa Extras General Terms and Conditions for the amount of the fee. The Visa Extras General Terms and Conditions are incorporated herein by reference.

19. GOVERNING LAW. This Agreement and the Account, as well as the Bank's rights and duties regarding this Agreement and the Account, will be governed by the laws respecting national banking associations and, to the extent not so covered by those laws, by the laws of the State of Delaware, without reference to that state's principles of conflicts of law, regardless of where Company resides or where a Cardholder uses the Account.

20. ARBITRATION. Any dispute or controversy concerning Company's use of the card program covered by this Agreement will be decided by binding arbitration conducted in the United States of America in accordance with the United States Arbitration Act (Title 9, U.S. Code) under the Commercial Arbitration Rules of the American Arbitration Association. Under these procedures, the dispute is submitted to a neutral person for determination in place of a trial before a judge or jury. Judgment upon the award made by the arbitrator may be entered in any court having jurisdiction. Either party may exercise self-help remedies or obtain provisional or ancillary remedies from a court. Either party may exercise these remedies at any time, even while the arbitration is pending. By exercising or obtaining any such remedies, neither party waives the right to request that a dispute or controversy be decided by arbitration.

21. TELEPHONE MONITORING. Company agrees that the Bank may monitor and/or record any telephone communications with Company in those countries which permit that practice. If the Bank's records about any such communication are different from Company's, the Bank's records will govern.

22. SUCCESSORS AND ASSIGNS. This Agreement and all terms and conditions hereof, are not assignable or transferable by Company without the Bank's prior written consent. All the terms and provisions of this Agreement will inure to the benefit of and be binding upon each party and its successors and permitted assigns. The Agreement is not for the benefit of any other person, and no other person shall have any right under the Agreement against either party.

23. NOTICES. Any written notice or other written communication to be given under the terms of this Agreement will be addressed to the applicable address specified on the signature page, except as the parties specify otherwise in writing. Notices are effective upon receipt, except as otherwise provided in this Agreement. If Company chooses to use unencrypted electronic mail to initiate payment requests or other instructions or otherwise communicate with Bank, Company's use of such electronic mail with respect to this Agreement will be subject to the terms and conditions of this Agreement and will comply with the applicable User Documentation. In addition, Company agrees to bear the risk that such electronic mail may be corrupted, modified, garbled or hacked or its confidentiality may be breached by a third party and the risk that Bank will rely on such mail, which appears to be from Company but which is unauthorized, and that such reliance will result in a loss.

24. CONFIDENTIALITY. Bank acknowledges that information it obtains from Company in connection with the Agreement may be confidential. Bank will maintain the confidentiality of such information in accordance with its normal procedures for safeguarding customer information and the policy reflected in the Bank of America Corporation Code of Ethics.

Company acknowledges Bank's claim to proprietary rights in the User Documentation and that the User Documentation constitutes Bank's "trade secrets" or trade secrets of Bank's licensors or vendors. Company understands that all User Documentation is confidential and it will maintain the Bank's confidentiality of such information.

These confidentiality obligations continue after the Agreement is terminated.

Company has sole responsibility for the custody, control and use of all User Documentation. Company agrees that no individual will be allowed to initiate a request or other instruction contemplated in this Agreement or to have access to any User Documentation without proper supervision and strict security controls. Bank will be fully protected in relying on the correct user identification codes and passwords, as described in the relevant User Documentation.

This section does not limit either party's ability to disclose information (i) that the other party has approved by prior writing for disclosure; (ii) that is disclosed to its professional advisors or auditors; (iii) that becomes public other than through a breach of these confidentiality obligations, (iv) that was in its possession or available to it from a third party prior to its receipt of it in connection with a Service, (v) which is obtained by it from a third party who is not known by it to be bound by a confidentiality agreement with respect to that information, (vi) as required or requested by any securities exchange or regulatory body to which either party is subject or submits or (vii) as otherwise required to be disclosed by law or by legal or governmental process.

In addition, Company agrees (i) that Bank may disclose to its offices, affiliates, officers, employees and agents with a need to know any information Bank obtains about Company and (ii) that those offices, affiliates, officers, employees and agents may disclose such information as permitted under the immediately preceding paragraph.

Company acknowledges and agrees that data processing related to this Agreement and Company's associated accounts may take place in countries other than those where Company and its accounts with Bank are located. Company further understands that information concerning its relationship with Bank may be available on Bank's electronic data system both for information management purposes and in order to enable Company to benefit from Bank's electronic banking services. Company understands and agrees that, as a result, Company's banking relationship information may be available to some of Bank's officers outside the country or countries where Company and its accounts are located. Company authorizes Bank to transmit Company's banking relationship information across national borders, notwithstanding the banking secrecy laws of any of the countries involved, as necessary or appropriate to provide the Commercial Card service.

It is possible that in providing the Commercial Card service Bank will transmit information Bank receives from Company in connection with the Commercial Card service consisting of an individual's bank accounts or other financial data or identifying a living individual ("Personal Data"). Bank will only transmit Personal Data to Bank's locations, to locations of Bank's affiliates or to others in order to provide a Commercial Card service. Bank may contract with others to provide data transmission or storage services to Bank. In that case, Bank will require that they treat Personal Data solely in accordance with Bank's instructions. Company agrees to comply with any directions Bank may give Company from time to time with respect to the Personal Data.

Neither party will use the other's name or refer to the other party directly or indirectly in any solicitation, marketing material, advertisement, news release or other release to any publication without receiving the other party's specific prior written approval for each such use or release, except that Bank may use Company's name as a reference in service proposals if Bank obtains Company's prior oral approval for such use.

25. SEVERABILITY. If any provision of this Agreement or the application of any such provision to any person or set of circumstances is held to be invalid, unlawful, void or unenforceable to any extent, the remainder of the Agreement, and the application of such provision to persons or circumstances other than those as to which it is determined to be invalid, unlawful, void or unenforceable, shall not be impaired or otherwise affected and shall continue to be valid and enforceable to the fullest extent permitted by law.

26. INDEMNIFICATION. Company agrees to indemnify Bank and hold Bank harmless from and defend Bank against any and all liabilities, claims, costs, expenses and damages of any nature (including legal expenses, attorneys' fees and allocated costs for in-house legal services) arising out of or relating to disputes or legal actions by parties other than Company and the Bank concerning the services provided under this Agreement. The obligations contained in the preceding sentence will continue after the Agreement is terminated. This section does not apply to any cost or damage attributable to the Bank's gross negligence or intentional misconduct.

27. LIMITATION OF LIABILITY.

A. The Bank is liable to Company only for actual damages incurred as a direct result of the Bank's failure to exercise reasonable care in providing the services under this Agreement.

B. In no event will the Bank be liable for any indirect, consequential or punitive loss, damage, cost or expense of any nature or any economic loss or damage, expense any loss of business, profits or revenue, goodwill and anticipated savings, loss of or corruption to Company's data, loss of operation time or loss of contracts, even if advised of the possibility of such loss, damage, cost or expense.

C. The Bank will not be responsible for the acts or omissions of Company or its officers, employees or agents (including but not limited to the amount, accuracy, timeliness or authorization of any instructions or information from Company) or the acts or omissions of any other person or entity, including but not limited to any clearing house association or processor, any U.S. Federal Reserve Bank or any other country's central bank, any other financial institution or any supplier, and no such person or entity will be deemed the Bank's agent.

D. The Bank will not be liable for and will be excused from any failure or delay in performing its obligations under this Agreement if such failure or delay is caused by circumstances beyond its control, including any natural disaster (such as earthquakes or floods), emergency conditions (such as war, riot, fire, theft or labor dispute), legal constraint or governmental action or inaction, breakdown or failure of equipment, breakdown of any supplier, or Company's act, omission, negligence or fault.

E. The Bank will not be liable for any failure to act on its part if it reasonably believes that the Bank's action would have violated any law, rule or regulation.

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the Effective Date, by its duly authorized officer(s).

**COMPANY**

WirelessPCS FL, LLC
(COMPANY'S LEGAL NAME)

By: [signature]
(Signature)

Name: Moeen Khalil
(Print or Type)

Title: MBR MGR
(Print or Type)

**FIA CARD SERVICES, N.A., a Bank of America Company**

By: [signature]
(Signature)

Name: FRANK SANBERNO
(Print or Type)

Title: VICE-PRESIDENT / CLIENT MANAGER
(Print or Type)

Address for Notices:

14537 S Military Trail
Suite B
Delray Beach, FL 33484

Address for Notices:

2970 TRANSIT RD.
W. SENECA, NY 14224

Bank of America
Merrill Lynch

# FIA CARD SERVICES, N.A. CORPORATE CARD SERVICE AGREEMENT PARTICIPANT ACCOUNT FORM

Company Name WIRELESSPCS FL, LLC (the "Company")

Participant Name WIRELESSPCS FL, LLC (the "New Participant")

The Bank of America Corporate Card Service Agreement between FIA Card Services, N.A, a Bank of America company (the "Bank") and the Company (the "Agreement")

This is a Participant Account Form for the purposes of the Agreement.

Terms defined in the Agreement have the same meaning when used in this Participant Account Form unless the context requires otherwise.

The New Participant is a [Subsidiary/ affiliate] *(delete as appropriate)* of the Company and wishes to become a Participant for the purposes of the Agreement.

By completing and signing this form:

1 the Bank and the Company agree to add the New Participant as a party to the Agreement to receive the Services from the Bank under the terms of the Agreement with effect from December 19, 2011 (the "Effective Date");

2 the New Participant undertakes to be bound by the terms and conditions of the Agreement (as amended from time to time) as if it were a party to the Agreement as a Participant and to become a Participant with effect from the Effective Date. The New Participant hereby agrees to the terms of the Agreement, a copy of which is attached as Appendix 1 to this Participant Account Form;

3 with effect from the Effective Date, the Agreement shall be read and construed as if the New Participant were a party to the Agreement having all rights and obligations of the Company. This Participant Account Form and the Agreement shall be read and construed together as a single agreement;

4 the New Participant authorizes the Company to complete and sign any and all future forms or documents relating to this Participant Account Form or the Agreement for and on behalf of the Participant;

5 the Participant acknowledges and agrees that the Company and the Bank may complete and sign a Participant Account Form with future new Participants without giving the New Participant prior notice and such new Participants will thereby become party to the Agreement; and

6 in consideration of the Bank providing Services under the terms of the Agreement, the New Participant and the Company agree to be jointly and severally liable for payment of all transactions made on the New Participant's account(s) with effect from the Effective Date

Bank of America
Merrill Lynch

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the Effective Date, by its duly authorized officer(s).

Signed by:

**Company:** WIRELESSPCS FL, LLC (name of the Company)

Moeen Khalil / MBR MGR (name and position of authorized signatory)

**Participant:** WIRELESSPCS FL, LLC (name of the Participant)

Moeen Khalil / MBR MGR (name and position of authorized signatory)

**Bank:** FIA Card Services, N.A.

(name and position of authorized signatory)

Bank of America
Merrill Lynch

## Appendix 1

*[Copy of the signed Agreement to be attached]*

Bank of America
Merrill Lynch

# FIA CARD SERVICES, N.A. CORPORATE CARD SERVICE AGREEMENT PARTICIPANT ACCOUNT FORM

| | | |
|---|---|---|
| Company Name | WIRELESSPCS FL LLC | (the "Company") |
| Participant Name | WIRELESSPCS TX LLC | (the "New Participant") |

The Bank of America Corporate Card Service Agreement between FIA Card Services, N.A, a Bank of America company (the "Bank") and the Company (the "Agreement")

This is a Participant Account Form for the purposes of the Agreement.

Terms defined in the Agreement have the same meaning when used in this Participant Account Form unless the context requires otherwise.

The New Participant is a [Subsidiary/ affiliate] *(delete as appropriate)* of the Company and wishes to become a Participant for the purposes of the Agreement.

By completing and signing this form:

1 the Bank and the Company agree to add the New Participant as a party to the Agreement to receive the Services from the Bank under the terms of the Agreement with effect from December 19, 2011 (the "Effective Date");

2 the New Participant undertakes to be bound by the terms and conditions of the Agreement (as amended from time to time) as if it were a party to the Agreement as a Participant and to become a Participant with effect from the Effective Date. The New Participant hereby agrees to the terms of the Agreement, a copy of which is attached as Appendix 1 to this Participant Account Form;

3 with effect from the Effective Date, the Agreement shall be read and construed as if the New Participant were a party to the Agreement having all rights and obligations of the Company. This Participant Account Form and the Agreement shall be read and construed together as a single agreement;

4 the New Participant authorizes the Company to complete and sign any and all future forms or documents relating to this Participant Account Form or the Agreement for and on behalf of the Participant;

5 the Participant acknowledges and agrees that the Company and the Bank may complete and sign a Participant Account Form with future new Participants without giving the New Participant prior notice and such new Participants will thereby become party to the Agreement; and

6 in consideration of the Bank providing Services under the terms of the Agreement, the New Participant and the Company agree to be jointly and severally liable for payment of all transactions made on the New Participant's account(s) with effect from the Effective Date

Bank of America Merrill Lynch

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the Effective Date, by its duly authorized officer(s).

Signed by:

Company: WIRELESSPCS FL, LLC (name of the Company)

Moeen Khalil / MBR MGR (name and position of authorized signatory)

Participant: WIRELESSPCS TX, LLC (name of the Participant)

Moeen Khalil / MBR MGR (name and position of authorized signatory)

Bank: FIA Card Services, N.A.

(name and position of authorized signatory)

Bank of America
Merrill Lynch

## Appendix 1

*[Copy of the signed Agreement to be attached]*

Bank of America Merrill Lynch

## FIA CARD SERVICES, N.A. CORPORATE CARD SERVICE AGREEMENT PARTICIPANT ACCOUNT FORM

| | | |
|---|---|---|
| Company Name | WIRELESSPCS FL, LLC | (the "Company") |
| Participant Name | WIRELESSPCS CA, LLC | (the "New Participant") |

The Bank of America Corporate Card Service Agreement between FIA Card Services, N.A, a Bank of America company (the "Bank") and the Company (the "Agreement")

This is a Participant Account Form for the purposes of the Agreement.

Terms defined in the Agreement have the same meaning when used in this Participant Account Form unless the context requires otherwise.

The New Participant is a [Subsidiary/ affiliate] *(delete as appropriate)* of the Company and wishes to become a Participant for the purposes of the Agreement.

By completing and signing this form:

1 the Bank and the Company agree to add the New Participant as a party to the Agreement to receive the Services from the Bank under the terms of the Agreement with effect from December 19, 2011 (the "Effective Date");

2 the New Participant undertakes to be bound by the terms and conditions of the Agreement (as amended from time to time) as if it were a party to the Agreement as a Participant and to become a Participant with effect from the Effective Date. The New Participant hereby agrees to the terms of the Agreement, a copy of which is attached as Appendix 1 to this Participant Account Form;

3 with effect from the Effective Date, the Agreement shall be read and construed as if the New Participant were a party to the Agreement having all rights and obligations of the Company. This Participant Account Form and the Agreement shall be read and construed together as a single agreement;

4 the New Participant authorizes the Company to complete and sign any and all future forms or documents relating to this Participant Account Form or the Agreement for and on behalf of the Participant;

5 the Participant acknowledges and agrees that the Company and the Bank may complete and sign a Participant Account Form with future new Participants without giving the New Participant prior notice and such new Participants will thereby become party to the Agreement; and

6 in consideration of the Bank providing Services under the terms of the Agreement, the New Participant and the Company agree to be jointly and severally liable for payment of all transactions made on the New Participant's account(s) with effect from the Effective Date

Bank of America Merrill Lynch

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the Effective Date, by its duly authorized officer(s).

Signed by:

**Company:** WIRELESSPCS FL, LLC (name of the Company)

Moeen Khalil / MBR MGR (name and position of authorized signatory)

**Participant:** WIRELESSPCS CA, LLC (name of the Participant)

Moeen Khalil / MBR MGR (name and position of authorized signatory)

**Bank:** FIA Card Services, N.A.

(name and position of authorized signatory)

Bank of America
Merrill Lynch

## Appendix 1

*[Copy of the signed Agreement to be attached]*

Bank of America
Merrill Lynch

# FIA CARD SERVICES, N.A. CORPORATE CARD SERVICE AGREEMENT PARTICIPANT ACCOUNT FORM

Company Name WIRELESSPCS FL, LLC (the "Company")

Participant Name WIRELESSPCS MI, LLC (the "New Participant")

The Bank of America Corporate Card Service Agreement between FIA Card Services, N.A. a Bank of America company (the "Bank") and the Company (the "Agreement")

This is a Participant Account Form for the purposes of the Agreement.

Terms defined in the Agreement have the same meaning when used in this Participant Account Form unless the context requires otherwise.

The New Participant is a [Subsidiary/ affiliate] *(delete as appropriate)* of the Company and wishes to become a Participant for the purposes of the Agreement.

By completing and signing this form:

1 the Bank and the Company agree to add the New Participant as a party to the Agreement to receive the Services from the Bank under the terms of the Agreement with effect from December 19, 2011 (the "Effective Date");

2 the New Participant undertakes to be bound by the terms and conditions of the Agreement (as amended from time to time) as if it were a party to the Agreement as a Participant and to become a Participant with effect from the Effective Date. The New Participant hereby agrees to the terms of the Agreement, a copy of which is attached as Appendix 1 to this Participant Account Form;

3 with effect from the Effective Date, the Agreement shall be read and construed as if the New Participant were a party to the Agreement having all rights and obligations of the Company. This Participant Account Form and the Agreement shall be read and construed together as a single agreement;

4 the New Participant authorizes the Company to complete and sign any and all future forms or documents relating to this Participant Account Form or the Agreement for and on behalf of the Participant;

5 the Participant acknowledges and agrees that the Company and the Bank may complete and sign a Participant Account Form with future new Participants without giving the New Participant prior notice and such new Participants will thereby become party to the Agreement; and

6 in consideration of the Bank providing Services under the terms of the Agreement, the New Participant and the Company agree to be jointly and severally liable for payment of all transactions made on the New Participant's account(s) with effect from the Effective Date

Bank of America Merrill Lynch

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the Effective Date, by its duly authorized officer(s).

Signed by:

**Company:** WIRELESSPCS FL, LLC (name of the Company)

Moeen Khalil / MBR MGR (name and position of authorized signatory)

**Participant:** WIRELESSPCS MI, LLC (name of the Participant)

Moeen Khalil / MBR MGR (name and position of authorized signatory)

**Bank:** FIA Card Services, N.A.

(name and position of authorized signatory)

AVP 750

Bank of America
Merrill Lynch

## Appendix 1

*[Copy of the signed Agreement to be attached]*

Bank of America
Merrill Lynch

# FIA CARD SERVICES, N.A. CORPORATE CARD SERVICE AGREEMENT PARTICIPANT ACCOUNT FORM

| | | |
|---|---|---|
| Company Name | WIRELESSPCS FL, LLC | (the "Company") |
| Participant Name | WIRELESSPCS PA, LLC | (the "New Participant") |

The Bank of America Corporate Card Service Agreement between FIA Card Services, N.A, a Bank of America company (the "Bank") and the Company (the "Agreement")

This Is a Participant Account Form for the purposes of the Agreement.

Terms defined in the Agreement have the same meaning when used in this Participant Account Form unless the context requires otherwise.

The New Participant is a [Subsidiary/ affiliate] *(delete as appropriate)* of the Company and wishes to become a Participant for the purposes of the Agreement.

By completing and signing this form:

1 the Bank and the Company agree to add the New Participant as a party to the Agreement to receive the Services from the Bank under the terms of the Agreement with effect from December 19, 2011 (the "Effective Date");

2 the New Participant undertakes to be bound by the terms and conditions of the Agreement (as amended from time to time) as if it were a party to the Agreement as a Participant and to become a Participant with effect from the Effective Date. The New Participant hereby agrees to the terms of the Agreement, a copy of which is attached as Appendix 1 to this Participant Account Form;

3 with effect from the Effective Date, the Agreement shall be read and construed as if the New Participant were a party to the Agreement having all rights and obligations of the Company. This Participant Account Form and the Agreement shall be read and construed together as a single agreement;

4 the New Participant authorizes the Company to complete and sign any and all future forms or documents relating to this Participant Account Form or the Agreement for and on behalf of the Participant;

5 the Participant acknowledges and agrees that the Company and the Bank may complete and sign a Participant Account Form with future new Participants without giving the New Participant prior notice and such new Participants will thereby become party to the Agreement; and

6 in consideration of the Bank providing Services under the terms of the Agreement, the New Participant and the Company agree to be jointly and severally liable for payment of all transactions made on the New Participant's account(s) with effect from the Effective Date

Bank of America
Merrill Lynch

IN WITNESS WHEREOF, each of the parties has caused this Agreement to be executed as of the Effective Date, by its duly authorized officer(s).

Signed by:

**Company:** WIRELESSPCS FL, LLC (name of the Company)

Moeen Khalil / MBR MGR ______________ (name and position of authorized signatory)

**Participant:** WIRELESSPCS PA, LLC (name of the Participant)

Moeen Khalil / MBR MGR ______________ (name and position of authorized signatory)

**Bank:** FIA Card Services, N.A.

______________ (name and position of authorized signatory)

Bank of America
Merrill Lynch

**Appendix 1**

*[Copy of the signed Agreement to be attached]*

Bank of America

BORROWER:
WirelessPCS FL, LLC

GUARANTOR:
WirelessPCS TX, LLC
WirelessPCS CA, LLC
WirelessPCS MI, LLC
Saed H. Khalil
Moeen Khalil
WirelessPCS USA, LLC
Sky Net Wireless, LLC
WirelessPCS IN LLC
WirelessPCS CO LLC
WirelessPCS AZ , LLC
WirelessPCS CHICAGO LLC
WirelessPCS NC, LLC
Aco Wireless, LLC
Fixexpress.com LLC
Sky Net Wireless IL, LLC

## CONTINUING AND UNCONDITIONAL GUARANTY

1. The Guaranty. For valuable consideration, the undersigned, (whether one or more than one "Guarantor") hereby unconditionally guarantees and promises to pay promptly to Bank of America, N.A., its subsidiaries and affiliates (collectively, "Bank"), or order, in lawful money of the United States, any and all Indebtedness of WirelessPCS FL, LLC ("Borrower") to Bank when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. The liability of Guarantor under this Guaranty is not limited as to the principal amount of the Indebtedness guaranteed and includes, without limitation, liability for all interest, fees, indemnities, and other costs and expenses relating to or arising out of the Indebtedness and for all swap, derivative, foreign exchange or hedge or other similar transaction or arrangement ("Swap Obligations") now or hereafter owing from Borrower to Bank. No Guarantor will be deemed to be a guarantor of any Swap Obligation to the extent that such Guarantor is not an Eligible Contract Participant at the time such guaranty becomes effective with respect to such Swap Obligations as set forth in the Commodities Exchange Act (7 U.S.C., Sec. 1, et. seq.). The liability of Guarantor is continuing and relates to any Indebtedness, including that arising under successive transactions which shall either continue the Indebtedness or from time to time renew it after it has been satisfied. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. If multiple individuals or entities sign this Guaranty, their obligations under this Guaranty shall be joint and several. "Indebtedness" shall mean and includes any and all advances, debts, obligations and liabilities of Borrower, or any of them, previously, now or later made, incurred or created, whether voluntary or involuntary and however arising, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, including Swap Obligations and obligations under any deposit, treasury management or other similar transaction or arrangement, and whether any of the Borrowers may be liable individually or jointly with others, or whether recovery upon such Indebtedness may be or later becomes unenforceable.



EXHIBIT
tabbles
B

2. Obligations Independent. The obligations under this Guaranty are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.

3. Rights of Bank. Guarantor authorizes Bank, without notice or demand and without affecting its liability hereunder, from time to time to:

(a) renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest, or otherwise change the terms of any Bank Agreements;

(b) receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine;

(d) release or substitute any Guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness; and

(e) permit the Indebtedness to exceed Guarantor's liability under this Guaranty, and Guarantor agrees that any amounts received by Bank from any source other than Guarantor shall be deemed to be applied first to any portion of the Indebtedness not guaranteed by Guarantor.

4. Guaranty to be Absolute. Guarantor agrees that until the Indebtedness has been paid in full in immediately available funds and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner vary, discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty. Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Bank described in the immediately preceding paragraph of this Guaranty. It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional. This is a guaranty of payment and not merely a guaranty of collection. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower to Bank is rescinded or must be returned by Bank to Borrower, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation; and any guaranty of any indemnities, shall survive any termination of this Guaranty. In the event of the death of a Guarantor, the liability of the estate of the deceased Guarantor shall continue in full force and effect as to (i) the Indebtedness existing at the date of death, and any renewals or extensions, and (ii) loans or advances made to or for the account of Borrower after the date of the death of the deceased Guarantor pursuant to a commitment made by Bank to Borrower prior to the date of such death. As to all surviving Guarantors, this Guaranty shall continue in full force and effect after the death of a Guarantor, not only as to the Indebtedness existing at that time, but also as to the Indebtedness later incurred by Borrower to Bank. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Bank.

5. Guarantor's Waivers of Certain Rights and Certain Defenses. Guarantor waives:

(a) any right to require Bank to:

(i) proceed against Borrower or any other person;

(ii) marshal assets or proceed against or exhaust any security held from any of the Borrowers or any other person;

(iii) give notice of the terms, time and place of any public or private sale or other disposition of personal property security held from Borrower or any other person;

(iv) take any other action or pursue any other remedy in Bank's power; or

(v) make any presentment or demand for performance, or give any notice of nonperformance, acceleration, protest, notice of protest or notice of dishonor hereunder or in connection with any obligations or evidences of indebtedness held by Bank as security for or which constitute in whole or in part the Indebtedness guaranteed hereunder, or in connection with the creation of new or additional Indebtedness, or give any notice of acceptance of this Guaranty, or notices of any fact that might increase Guarantor's risk.

(b) any defense to its obligations under this Guaranty based upon or arising by reason of:

(i) any disability or other defense of Borrower or any other person;

(ii) the cessation or limitation from any cause whatsoever, other than payment in full, of the Indebtedness of Borrower or any other person;

(iii) any lack of authority of any officer, director, partner, agent or any other person acting or purporting to act on behalf Borrower which is a corporation, partnership or other type of entity, or any defect in the formation of Borrower;

(iv) the application by Borrower of the proceeds of any Indebtedness for purposes other than the purposes represented by Borrower to, or intended or understood by, Bank or Guarantor;

(v) any act or omission by Bank which directly or indirectly results in or aids the discharge of Borrower or any portion of the Indebtedness by operation of law or otherwise, or which in any way impairs or suspends any rights or remedies of Bank against Borrower;

(vi) any impairment of the value of any interest in any security for the Indebtedness, including without limitation, the failure to obtain or maintain perfection or recordation of any interest in any such security, the release of any such security without substitution, and/or the failure to preserve the value of, or to comply with applicable law in disposing of, any such security;

(vii) any modification of the Indebtedness, in any form whatsoever, including any modification made after revocation hereof to any Indebtedness incurred prior to such revocation, and including without limitation the renewal, extension, acceleration or other change in time for payment of, or other change in the terms of, the Indebtedness, including increase or decrease of the rate of interest;

(viii) any requirement that Bank give any notice of acceptance of this Guaranty;

(ix) any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower;

(x) the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty; or

(xi) any election of remedies by Bank, even though that election of remedies, such as a non-judicial foreclosure with respect to any security for any portion of the Indebtedness,

destroys Guarantor's rights of subrogation or Guarantor's rights to proceed against Borrower for reimbursement.

(c) until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated, even though the Indebtedness may be in excess of Guarantor's liability hereunder, to the extent permitted by applicable law, any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise).

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

6. Lien and Setoff. Guarantor grants to Bank a continuing lien, security interest, and right of setoff as security for all of Guarantor's liabilities and obligations to Bank, whether now existing or later arising, upon and against all the deposits, credits, collateral and property of Guarantor (other than clients' trust and other fiduciary accounts or escrows) now or hereafter in the possession, custody, or control of Bank or any entity under the control of Bank of America Corporation and its successors and assigns or in transit to any of them. At any time, without further demand or notice (any such notice being expressly waived by Guarantor), Bank may set off the same or any part thereof and apply the same to any liability or obligation of Guarantor even though unmatured and regardless of the adequacy of any other collateral securing this Guaranty. **TO THE EXTENT PERMITTED BY LAW, ANY AND ALL RIGHTS TO REQUIRE BANK TO EXERCISE ITS REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES THE LIABILITIES PRIOR TO EXERCISING ITS RIGHT OF SET OFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF GUARANTOR, ARE VOLUNTARILY, INTENTIONALLY, AND IRREVOCABLY WAIVED.**

7. Subordination. Any obligations of Borrower to Guarantor, now or hereafter existing, including but not limited to any obligations to Guarantor as subrogee of Bank or resulting from Guarantor's performance under this Guaranty, are hereby subordinated to the Indebtedness. Guarantor agrees that, if Bank so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Bank or facilities provided by Bank with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Bank and shall be paid over to Bank on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Bank may have on any such property.

8. Revocation of Guaranty.

(a) This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Bank, at the address shown below or at such other address as may have been provided to Guarantor by Bank, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Bank's rights with respect to transactions committed or entered into prior to Bank's receipt of such notice, nor shall it affect Guarantor's obligations with respect to any indemnities, executed prior to Bank's receipt of such notice.

(b) Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, ownership or composition or structure of Borrower, or the dissolution of Borrower.

9. Extent of Guaranty. If Guarantor is a subsidiary or affiliate of Borrower, in addition to the limitations on Guarantor's liability set forth above in Paragraph 1, Guarantor's liability hereunder shall not exceed at any one time the largest amount during the period commencing with Guarantor's execution of this Guaranty and thereafter that would not render Guarantor's obligations hereunder subject to avoidance under Section 548 of the Bankruptcy Code (Title 11, United States Code) or any comparable provisions of any applicable state law.

10. Taxes.

(a) Guarantor represents and warrants that it is organized and resident in the United States of America. All payments by Guarantor hereunder shall be paid in full, without setoff or counterclaim or any deduction or withholding whatsoever, including, without limitation, for any and all present and future taxes. If Guarantor must make a payment under this Guaranty, Guarantor represents and warrants that it will make the payment from one of its U.S. resident offices to Bank so that no withholding tax is imposed on the payment. Notwithstanding the foregoing, if Guarantor makes a payment under this Guaranty to which withholding tax applies or if any taxes (other than taxes on net income (i) imposed by the country or any subdivision of the country in which Bank's principal office or actual lending office is located and (ii) measured by the United States taxable income Bank would have received if all payments under or in respect of this Guaranty were exempt from taxes levied by Guarantor's country) are at any time imposed on any payments under or in respect of this Guaranty including, but not limited to, payments made pursuant to this paragraph, Guarantor shall pay all such taxes to the relevant authority in accordance with applicable law such that Bank receives the sum it would have received had no such deduction or withholding been made (or, if Guarantor cannot legally comply with the foregoing, Guarantor shall pay to Bank such additional amounts as will result in Bank receiving the sum it would have received had no such deduction or withholding been made). Further, Guarantor shall also pay to Bank, on demand, all additional amounts that Bank specifies as necessary to preserve the after-tax yield Bank would have received if such taxes had not been imposed.

(b) Guarantor shall promptly provide Bank with an original receipt or certified copy issued by the relevant authority evidencing the payment of any such amount required to be deducted or withheld.

11. Information Relating to Borrower. Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Bank Agreements as Guarantor deems necessary and appropriate, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications to the Bank Agreements. Guarantor further acknowledges that Bank has no duty, and Guarantor is not relying on Bank, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower. "Bank Agreements" shall mean all agreements, documents, and instruments evidencing any of the Indebtedness, including but not limited to all loan agreements between Borrower and Bank and promissory notes from Borrower in favor of Bank, and all deeds of trust, mortgages, security agreements, and other agreements, documents, and instruments executed by Borrower in connection with the Indebtedness, all as now in effect and as hereafter amended, restated, renewed, or superseded.

12. Borrower's Authorization. Where Borrower is a corporation, partnership, or limited liability company, it is not necessary for Bank to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty, subject to any limitations on Guarantor's liability set forth in this Guaranty.

13. Guarantor Information; Reporting to Credit Bureaus. Guarantor authorizes Bank to verify or check any information given by Guarantor to Bank, check Guarantor's credit references, verify employment, and obtain credit reports. Guarantor shall provide such financial statements and other financial information about Guarantor as Bank may request from time to time. Guarantor agrees that Bank shall have the right at all times to disclose and report to credit reporting agencies and credit rating agencies such information pertaining to the Indebtedness and/or Guarantor as is consistent with Bank's policies and practices from time to time in effect. Guarantor acknowledges and agrees that the authorizations provided in this paragraph apply to any individual general partner of Guarantor and to Guarantor's spouse and any such general partner's spouse if Guarantor or such general partner is married and lives in a community property state.

14. Change of Status. Any Guarantor that is a business entity shall not enter into any consolidation, merger, or other combination unless Guarantor is the surviving business entity. Further, Guarantor shall not change its legal structure unless (a) Guarantor obtains the prior written consent of Bank and (b) all

obligations of Guarantor under this Guaranty are assumed by the new business entity.

15. Remedies. If Guarantor fails to fulfill its duty to pay all indebtedness guaranteed hereunder or shall breach or fail to comply with any term or provision of this Guaranty, Bank shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, Bank may, at its option and without notice or demand:

(a) declare any indebtedness due and payable at once;

(b) take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Bank may impose reasonable conditions upon any such sale. Further, Bank, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided in this Guaranty; and

(c) set off and apply any and all deposit accounts of Guarantor held by Bank or its affiliates against any and all obligations of Guarantor owing to Bank. The set-off may be made irrespective of whether or not Bank shall have made demand under this Guaranty, and although such obligations may be contingent or unmatured or denominated in a currency different from that of the applicable deposit accounts and without regard for the availability or adequacy of other collateral. If exercised by Bank, Bank shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books after such default.

16. Notices. All notices required under this Guaranty shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Guaranty, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as Guarantor may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

17. Successors and Assigns. This Guaranty (a) binds Guarantor and Guarantor's executors, administrators, successors, and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Bank, and (b) inures to the benefit of Bank and Bank's indorsees, successors, and assigns. Bank may, without notice to Guarantor and without affecting Guarantor's obligations, sell participations in, or assign the indebtedness and this Guaranty, in whole or in part and may exchange information about Guarantor to any actual or potential participants or assignees.

18. Amendments, Waivers, and Severability. No provision of this Guaranty may be amended or waived except in writing. No failure by Bank to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver of such rights, remedies or powers, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

19. Costs and Expenses. Guarantor agrees to pay all reasonable attorneys' fees and all other costs and expenses that may be incurred by Bank (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Bank in any case commenced by or against Guarantor

under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute.

20. Representations and Warranties. When Guarantor signs this Guaranty, and until the Indebtedness is repaid in full and any commitments or facilities provided by Bank with respect to the Indebtedness have been terminated, Guarantor makes the following representations and warranties:

(a) If Guarantor is anything other than a natural person, it is duly formed and existing under the laws of the state or other jurisdiction where organized.

(b) This Guaranty, and any instrument or agreement required hereunder, are within Guarantor's powers, have been duly authorized, and do not conflict with any of its organizational papers.

(c) In each state in which Guarantor does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

(d) All financial and other information that has been or will be supplied to Bank is sufficiently complete to give Bank accurate knowledge of Guarantor's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to Bank, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of Guarantor. If Guarantor is comprised of the trustees of a trust, the foregoing representations shall also pertain to the trustor(s) of the trust.

(e) There is no lawsuit, tax claim or other dispute pending or threatened against Guarantor which, if lost, would impair Guarantor's financial condition or ability to repay the Indebtedness, except as have been disclosed in writing to Bank.

(f) Guarantor is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to Bank.

(g) Guarantor has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to Bank.

(h) There is no event which is, or with notice or lapse of time or both would be, a default by Guarantor under this Guaranty or under any other instrument or agreement executed in connection with the Indebtedness or this Guaranty.

(i) Guarantor will not be rendered insolvent by the execution, delivery, and performance of its obligations under this Guaranty.

(j) Guarantor, if a natural person, has obtained any spousal or other consents or waivers which may be required by applicable law.

(k) All collateral pledged by Guarantor to secure the Indebtedness or this Guaranty is owned by Guarantor free of any title defects or any liens or interests of others, except those which have been approved by Bank in writing.

(l) The place of business of WirelessPCS TX, LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(m) The place of business of WirelessPCS CA, LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(n) The place of business of WirelessPCS MI, LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(o) The principal residence of Saed H. Khalil is located at the address listed on the signature page of this Guaranty.

(p) The principal residence of Moeen Khalil is located at the address listed on the signature page of this Guaranty.

(q) The place of business of WirelessPCS USA, LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(r) The place of business of Sky Net Wireless, LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(s) The place of business of WirelessPCS IN LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(t) The place of business of WirelessPCS CO LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(u) The place of business of WirelessPCS AZ , LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(v) The place of business of WirelessPCS CHICAGO LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(w) The place of business of WirelessPCS NC, LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(x) The place of business of Aco Wireless, LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(y) The place of business of Fixexpress.com LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

(z) The place of business of Sky Net Wireless IL, LLC (or, if this Guarantor has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Guaranty.

21. Governing Law. Except to the extent that any law of the United States may apply, this Guaranty shall be governed and interpreted according to the laws of Florida (the "Governing Law State"), without regard to any choice of law, rules or principles to the contrary. Nothing in this paragraph shall be construed to limit or otherwise affect any rights or remedies of Bank under federal law.

22. Venue and Jurisdiction. Guarantor agrees that any action or suit against Bank arising out of or relating to this Guaranty shall be filed in federal court or state court located in the Governing Law State. Guarantor agrees that Bank shall not be deemed to have waived its rights to enforce this section by filing an action or suit against Guarantor in a venue outside of the Governing Law State. If Bank does commence an action or suit arising out of or relating to this Guaranty, Guarantor agrees that the case may be filed in federal court or state court in the Governing Law State. Bank reserves the right to commence an action or suit in any other jurisdiction where Borrower, any Guarantor, or any collateral has any presence or is located. Guarantor consents to personal jurisdiction and venue in such forum selected by Bank and waives any right to contest jurisdiction and venue and the convenience of any such forum. The provisions of this section are material inducements to Bank's acceptance of this Guaranty.

23. Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS GUARANTY OR ANY OTHER DOCUMENT EXECUTED IN CONNECTION HEREWITH OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS GUARANTY AND THE OTHER DOCUMENTS CONTEMPLATED HEREBY BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION AND (c) CERTIFIES THAT THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE.

24. Waiver of Class Actions. The terms "Claim" or "Claims" refer to any disputes, controversies, claims, counterclaims, allegations of liability, theories of damage, or defenses between Bank of America, N.A., its subsidiaries and affiliates, on the one hand, and the parties to this Guaranty, on the other hand (all of the foregoing each being referred to as a "Party" and collectively as the "Parties"). Whether in state court, federal court, or any other venue, jurisdiction, or before any tribunal, the Parties agree that all aspects of litigation and trial of any Claim will take place without resort to any form of class or representative action. Thus the Parties may only bring Claims against each other in an individual capacity and waive any right they may have to do so as a class representative or a class member in a class or representative action. THIS CLASS ACTION WAIVER PRECLUDES ANY PARTY FROM PARTICIPATING IN OR BEING REPRESENTED IN ANY CLASS OR REPRESENTATIVE ACTION REGARDING A CLAIM.

25. Counterparts. This Guaranty may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement. Delivery of an executed counterpart of this Guaranty (or of any agreement or document required by this Guaranty and any amendment to this Guaranty) by telecopy or other electronic imaging means shall be as effective as delivery of a manually executed counterpart of this Guaranty; provided, however, that the telecopy or other electronic image shall be promptly followed by an original if required by the Bank.

26. Application of Singular and Plural. In all cases where there is but a single Borrower, then all words used herein in the plural shall be deemed to have been used in the singular where the context and construction so require; and when there is more than one Borrower, or when this Guaranty is executed by more than one Guarantor, the word "Borrower" or "Borrowers" and the word "Guarantor" respectively shall mean all or any one or more of them as the context requires.

27. Final Agreement. This Agreement and any related security agreements or other agreements required by this Agreement constitute the entire agreement between Guarantor and Bank with respect to the subject matter of this Guaranty and with respect to the credit facilities provided by Bank to Borrower and supersede all prior negotiations, communications, discussions and correspondence concerning the subject matter hereof. In the event of any conflict between this Agreement and any other agreements required by this

Agreement, this Agreement will prevail.

Executed this January 25, 2017.

**WirelessPCS TX, LLC**

By: ______________________________
Moeen Khalil, Manager

**WirelessPCS CA, LLC**

By: ______________________________
Moeen Khalil, Manager

**WirelessPCS MI, LLC**

By: ______________________________
Moeen Khalil, Manager

______________________________
Saed H. Khalil, Individually

______________________________
Moeen Khalil, Individually

**WirelessPCS USA, LLC**

By: ______________________________
Moeen Khalil, Manager

**Sky Net Wireless, LLC**

By: ______________________________
Moeen Khalil, Manager

**WirelessPCS IN LLC**

By: ______________________________
Moeen Khalil, Manager

**WirelessPCS CO LLC**

By: ______________________________
Moeen Khalil, Manager

**WirelessPCS AZ, LLC**

By: ______________________________
Moeen Khalil, Manager

**WirelessPCS CHICAGO LLC**

By: ______________________________
Moeen Khalil, Manager

**WirelessPCS NC, LLC**

By: ______________________________
Moeen Khalil, Manager

**Aco Wireless, LLC**

By: ______________________________
Moeen Khalil, Manager

**Fixexpress.com LLC**

By: ______________________________
Moeen Khalil, Manager

**Sky Net Wireless IL, LLC**

By: ______________________________
Moeen Khalil, Manager

Address for notices to Bank:
Doc Retention Center
NC1-001-05-13
One Independence Center
101 North Tryon St
Charlotte, NC 28255-0001
Facsimile: (866) 255-9922

Address for notices to Guarantor:
WirelessPCS TX, LLC
1585 S Congress Ave
Delray Beach, FL 33445

WirelessPCS CA, LLC
1585 S Congress Ave
Delray Beach, FL 33445

WirelessPCS MI, LLC
1585 S Congress Ave
Delray Beach, FL 33445

Saed H. Khalil
12888 Pennell Pines Rd
Boynton Beach, FL 33436-6122

Moeen Khalil
514 S Glen Ave
Tampa, FL 33609-3022

WirelessPCS USA, LLC
1585 S Congress Ave
Delray Beach, FL 33445

Sky Net Wireless, LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

WirelessPCS IN LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

WirelessPCS CO LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

WirelessPCS AZ , LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

WirelessPCS CHICAGO LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

WirelessPCS NC, LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

Aco Wireless, LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

Fixexpress.com LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

Sky Net Wireless IL, LLC
14537 S Military Trl Ste B
Delray Beach, FL 33484

***Federal law requires Bank of America, N.A. (the "Bank") to provide the following two notices. The notices are not part of the foregoing agreement or instrument and may not be altered. Please read the notices carefully.***

***These notices apply only to Individual Borrowers or Guarantors and Individuals who are pledging collateral, granting a lien on real property or are otherwise obligated to the Bank (Obligors):***

**(1) AFFILIATE SHARING NOTICE**

From time to time the Bank may share information about the Obligor's experience with Bank of America Corporation (or any successor company) and its subsidiaries and affiliated companies (the "Affiliates"), including, but not limited to, the Bank of America Companies listed in notice #2 below. The Bank may also share with the Affiliates credit-related information contained in any applications, from credit reports and information it may obtain about the Obligor from outside sources.

If the Obligor is an individual, the Obligor may instruct the Bank not to share this information with the Affiliates. The Obligor can make this election by (1) visiting the Bank online at bankofamerica.com/privacy or (2) calling the Bank toll-free at 888.341.5000. To help the Bank complete the Obligor's request, the Obligor should include the Obligor's name, address, phone number, account number(s) and social security number.

If the Obligor makes this election, certain products or services may not be made available to the Obligor. This request will apply to information from applications, consumer reports and other outside sources only. Through the normal course of doing business, including servicing the Obligor's accounts and better serving the Obligor's financial needs, the Bank will continue to share transaction and account experience information, as well as other general information among the Affiliates.

**(2) AFFILIATE MARKETING NOTICE – YOUR CHOICE TO LIMIT MARKETING**

- The Bank of America companies listed below are providing this notice #2.

- Federal law gives you the right to limit some but not all marketing from all the Bank of America affiliated companies. Federal law also requires us to give you this notice to tell you about your choice to limit marketing from all the Bank of America affiliated companies.

- You may limit all the Bank of America affiliated companies, such as the banking, loan, credit card, insurance and securities companies, from marketing their products or services to you based upon your personal information that they receive from other Bank of America companies. This information includes your income, your account history, and your credit score.

- Your choice to limit marketing offers from all the Bank of America affiliated companies will apply for at least 5 years from when you tell us your choice. Before your choice to limit marketing expires, you will receive a renewal notice that will allow you to continue to limit marketing offers from all the Bank of America affiliated companies for at least another 5 years.

- You may tell us your choice to limit marketing offers and you may tell us the choices for other customers who are joint account holders with you.
- This limitation will not apply in certain circumstances, such as when you have an account or service relationship with the Bank of America company that is marketing to you.
- For individuals with business purpose accounts, this limitation will only apply to marketing to individuals and not marketing to a business.

**To limit marketing offers, contact us at 888.341.5000**

**Bank of America Companies:**

This notice applies to all Bank of America entities that utilize the names:

Bank of America
Banc of America
U.S. Trust
Merrill Lynch

These entities include banks and trust companies; credit card companies; brokerage and investment companies; insurance and annuities companies; and real estate companies.

In addition, this notice applies to the following Bank of America companies:

Managed Account Advisors LLC
General Fidelity Life Insurance Company
NationsCredit Financial Services Corporation
BAL Corporate Aviation, LLC
BAL Energy Holding, LLC
BAL Energy Management II, LLC
BAL Investment & Advisory, Inc.